**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

THALES VISIONIX, INC.,

     Plaintiff,

  v.

THE UNITED STATES OF AMERICA,

     Defendant

  and

ELBIT SYSTEMS OF AMERICA,

    Third-Party Defendant.

Case No. 1:14-cv-00513-TCW

Hon. Thomas C. Wheeler

**MOTION FOR JUDGMENT ON THE PLEADINGS UNDER RCFC 12(c)
FILED BY THE UNITED STATES OF AMERICA AND
ELBIT SYSTEMS OF AMERICA**

# TABLE OF CONTENTS

Page

I.  BACKGROUND ...................................................................................................... 2

    A.  Procedural Posture ............................................................................... 2

    B.  TVI's '159 Patent ................................................................................. 2

II.  LEGAL STANDARD ............................................................................................ 7

    A.  A Patent May Not Claim Abstract Ideas Without an "Inventive Concept." ........... 7

    B.  A Court May Grant Judgment On The Pleadings For Ineligible Subject Matter, Without Engaging In Claim Construction Proceedings. ........................... 8

III.  THE CLAIMS OF THE '159 PATENT ARE INVALID UNDER SECTION 101 ......... 10

    A.  The Independent Claims Are Directed To A Patent-Ineligible Mathematical Formula, With No Inventive Concept ........................................... 10

        1.  The Claims Fail Alice Step One Because They Are Drawn On Their Face To An Abstract Formula ......................................................... 10

        2.  The Claims Fail Alice Step Two Because They Recite Routine, Conventional Equipment For Implementing The Abstract Idea ............... 13

    B.  The Numerous Dependent Claims Are Also Patent-Ineligible ............................. 19

IV.  CONCLUSION .................................................................................................... 23

# TABLE OF AUTHORITIES

**Cases**                                                                      **Page(s)**

*Accenture*, *Global Servs., GmbH v. Guidewire Software, Inc.*,
728 F.3d 1336 (Fed. Cir. 2013).................................................................................12

*Alice Corp. Pty. Ltd. v. CLS Bank International*,
134 S. Ct. 2347 (2014) .................................................................................... *passim*

*Ameritox, Ltd v. Millennium Health, LLC*,
No. 13-cv-832-wmc, 2015 WL 728501 (W.D. Wis. Feb. 19, 2015) .......................8

*Ash v. Reilly*,
433 F. Supp. 2d 37 (D.D.C. 2006) ..........................................................................2

*Bancorp Servs., L.L.C. v. Sun Life Assurance Co. of Canada*,
687 F.3d 1266 (Fed. Cir. 2012).........................................................................9, 12

*Barnes v. United States*,
68 Fed.Cl. 492 (2005) ..............................................................................................8

*In re Bilski*,
545 F.3d 943 (Fed. Cir. 2008)..........................................................................15, 20

*Bilski v. Kappos*,
561 U.S. 593 (2010)...................................................................................... 7, 8, 15

*buySAFE, Inc. v. Google, Inc.*,
765 F. 3d 1350 (Fed. Cir. 2014)..............................................................................8

*Cardpool, Inc. v. Plastic Jungle, Inc.*,
No. C 12-04182 WHA, 2013 WL 245026 (N.D. Cal. Jan. 22, 2013)......................9

*Clear with Computers, LLC v. Dick's Sporting Goods, Inc.*,
21 F. Supp. 3d 758 (E.D. Tex. 2014) ......................................................................9

*CLS Bank Int'l v. Alice Corp. Pty. Ltd.*,
717 F.3d 1269 (Fed. Cir.), *cert granted*, 134 S. Ct. 734 (2013), *aff'd*, 134 S.
Ct. 2347 (2014)), *cert. denied*, 134 S. Ct. 2871 (2014) ........................................12

*CMG Fin.l Servs., Inc. v. Pac. Trust Bank*,
No. CV 11-10344-PSG, Dkt. 164 (C.D. Cal. Aug. 29, 2014) .................................9

*In re Comiskey*,
554 F.3d 967 (Fed. Cir. 2009)..................................................................................8

*Content Extraction & Transmission LLC v. Wells Fargo Bank, N.A.*,
776 F.3d 1343 (Fed. Cir. 2014)..........................................................................8, 9

*Curtin v. United States*,
91 Fed. Cl. 683 (2010) ............................................................................................2

*DDR Holdings, LLC v. Hotels.com, L.P.*,
773 F.3d 1245 (Fed. Cir. 2014)......................................................................11, 21

*Demodulation, Inc. v. United States*,
114 Fed. Cl. 655 (2014) ..........................................................................................8

*Diamond v. Chakrabarty*,
447 U.S. 303 (1980)...............................................................................................13

*Diamond v. Diehr*,
450 U.S. 175 (1981).........................................................................................16, 17

*Eclipse IP LLC v. McKinley Equip. Corp.*,
No. CV 14-154-GW, Dkt. No. 50, at 17 (C.D. Cal. Sept. 4, 2014) ......................8, 9

*Gametek LLC v. Zynga, Inc.*,
No. CV 13-2546RS, 2014 WL 1665090 (N.D. Cal. Apr. 25, 2014) .........................9

*Gottschalk v. Benson*,
409 U.S. 63 (1972).................................................................................................13

*In re Grams*,
888 F.2d 835 (Fed. Cir. 1989).........................................................15, 16, 17, 20

*I/P Engine, Inc. v. AOL, Inc.*,
576 F. App'x 982 (Fed. Cir. 2014) ......................................................................10

*Io Grp, Inc. v. Veoh Networks, Inc.*,
586 F. Supp. 2d 1132 (N.D. Cal. 2008) ................................................................2

*Lennon v. Metropolitan Life Ins. Co.*,
504 F.3d 617 (6th Cir. 2007) ................................................................................2

*LLC v. Wyndham Exch. & Rentals, Inc.*,
No. CV-12-04229-RGK, Dkt. No. 27 (C.D. Cal. Sept. 18, 2012)...........................9

*Lumen View Tech. LLC v. Findthebest.com, Inc.*,
984 F. Supp. 2d 189 (S.D.N.Y. 2013)....................................................................9

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.*,
132 S. Ct. 1289 (2012).........................................................................................19

*In re Meyer*,
688 F.2d 789 (C.C.P.A. 1982) ...............................................................................15, 20

*Money Suite Co. v. 21st Century Ins. & Fin. Servs., Inc.*,
No. 13-1748-GMS, 2015 WL 436160 (D. Del. Jan. 27, 2015) ................................8

*OIP Technologies, Inc. v. Amazon.com, Inc.*,
No. C12-1233 EMC, 2012 WL 3985118 (N.D. Cal. Sept. 11, 2012).......................9

*Parker v. Flook*,
437 U.S. 584 (1978).......................................................................................... *passim*

*Research Corp. Techs., Inc. v. Microsoft Corp.*,
627 F.3d 859 (Fed. Cir. 2010)...............................................................................10

*Rojas Mamani v. Sanchez Berzain*,
636 F. Supp. 2d 1326 (S.D. Fla. 2009) ..................................................................2

*In re Schrader*,
22 F.3d 290 (Fed. Cir. 1994)..................................................................................16

*In re TLI Commc'ns LLC Patent Litig.*,
No. 1:14md2534, 2015 WL 627858 (E.D.V.A. Feb. 6, 2015) .................................8

*Ultramercial, Inc. v. Hulu, LLC*,
772 F.3d 709 (Fed. Cir. 2014)........................................................................8, 9, 10

*Uniloc USA, Inc. v. Rackspace Hosting, Inc.*,
18 F. Supp. 3d 831 (E.D. Tex. 2013) ......................................................................9

**Statutes**

35 U.S.C. § 101............................................................................................... *passim*

**Other Authorities**

2 James Wm. Moore et al., *Moore's Federal Practice* § 12.34[2] (3d ed. 1999) .....................2

Fed. R. Evid. 201(b)......................................................................................................2

Federal Rule Civil Procedure 12 ...............................................................................8

Rule 12(c) of the Rules of the Court of Federal Claims .........................................8

Defendant The United States of America ("the Government") and Third-Party Defendant Elbit Systems of America ("Elbit") (jointly, "Defendants") request judgment on the pleadings that the claims of Thales Visionix, Inc. ("TVI")'s U.S. Patent No. 6,474,159 (the "'159 Patent") are invalid as a matter of law because they claim a patent-ineligible law of nature in violation of 35 U.S.C. § 101 ("Section 101") and the Supreme Court's recent decision in *Alice Corp. Pty. Ltd. v. CLS Bank International*, 134 S. Ct. 2347 (2014).

To satisfy Section 101 under *Alice*, patent claims must do something "significantly more" than describe a law of nature or abstract idea. Here, TVI's patent claims stake out a set of mathematical equations used to track an object relative to another moving object (referred to in the patent as a moving reference frame). But the Supreme Court has made clear that mathematical formulae are akin to laws of nature, and therefore unpatentable, even by those purporting to be the first to discover them. A patent applicant cannot avoid this rule by embellishing claims with standard data gathering steps and generic computing elements.

TVI's claims in this case do just that: they recite conventional, generic equipment— inertial sensors and a computing "element"—for feeding data into navigation equations and calculating results. The '159 Patent readily admits that such equipment long existed in the prior art, and makes no claim to have invented any new hardware. Therefore, just as Einstein could not patent his equation $E=mc^2$, or conventional hardware for computing it, TVI cannot enforce its claims, which are drawn to equations and conventional hardware for implementing them.

This case is like the dozens of cases since *Alice* where district courts have refused to enforce an exclusionary patent right on an abstract idea or law of nature. For the reasons discussed below, the claims of the patent-in-suit should be declared invalid before the Court and the parties needlessly expend any further resources on this case.

I.      BACKGROUND

A.      Procedural Posture

TVI filed its Complaint against the Government on June 16, 2014.  Dkt. 1.  The

Government provided its Answer on October 14, 2014, denying the allegations and asserting a

variety of defenses.  Dkt. 11.  Elbit joined the suit two months later, on December 9, 2014, after

it received a notice from the Court of this case.  Dkt. 16.  On March 20, 2015, Thales served its

Disclosure of Asserted Claims and Preliminary Infringement Contentions alleging that the

Government has infringed claims 1–5, 11–13, 20, 22–26, 32–34, and 41 of the '159 Patent.

B.      TVI's '159 Patent

The '159 Patent, titled "Motion-Tracking," issued on November 5, 2002, claiming

priority to an application filed on April 21, 2000.  '159 Patent at (45), (22).  The patent relates to

an allegedly new way to compute the motion of an object using data received from "inertial

trackers" such as gyroscopes[1] and accelerometers.[2] '159 Patent at Abstract.[3]

---

[1] A gyroscope is a "a device for measuring or maintaining orientation, based on the principle of preserving angular momentum."  *See* http://en.wikipedia.org/wiki/Gyroscope.

[2] An accelerometer is "a device that measures proper acceleration ('g-force'). . . Micromachined accelerometers are increasingly present in portable electronic devices and video game controllers, to detect the position of the device or provide for game input."  *See* http://en.wikipedia.org/wiki/Accelerometer.

[3] "When deciding a motion for judgment on the pleadings, we may examine the content of the competing pleadings, exhibits thereto, matters incorporated by reference in the pleadings . . . and any facts of which the . . . court will take judicial notice."  *Curtin  v. United States*, 91 Fed. Cl. 683, 686 (2010) (citation and internal quotation marks omitted); *see also* 2 James Wm. Moore et al., *Moore's Federal Practice* § 12.34[2] (3d ed. 1999).  Courts may take judicial notice of adjudicative facts that are "not subject to reasonable dispute." Fed. R. Evid. 201(b).  Many courts have taken judicial notice of non-controversial facts by reference to Wikipedia.  *See, e.g.*, *Lennon v. Metropolitan Life Ins. Co.*, 504 F.3d 617, 623 (6th Cir. 2007) (taking judicial notice of Wikipedia article regarding correlation between blood alcohol levels and risk of fatal crashes); *Io Grp, Inc. v. Veoh Networks, Inc.*, 586 F. Supp. 2d 1132, 1145 n.8 (N.D. Cal. 2008) ("The court takes judicial notice of the Wikipedia definition of 'IP address' as to the fact that an IP address may be shared by multiple users. This is not a matter that is subject to reasonable dispute."); *Ash v. Reilly*, 433 F. Supp. 2d 37, 50 n.7 (D.D.C. 2006) (citing wikipedia definition of "machete"); *Rojas Mamani v. Sanchez Berzain*, 636 F. Supp. 2d 1326, 1330 n.5 (S.D. Fla. 2009) (taking

The '159 Patent also refers to "inertial trackers" as "Inertial Measurement Units" ("IMUs").  *See id.* at Abstract; 1:45–62.  An IMU is "an electronic device that measures and reports a craft's velocity, orientation, and gravitational forces, using a combination of accelerometers and gyroscopes, sometimes also magnetometers."  *See* http://en.wikipedia.org/wiki/Inertial_measurement_unit.  "An inertial measurement unit works by detecting the current rate of acceleration using one or more accelerometers, and detects changes in rotational attributes like pitch, roll and yaw using one or more gyroscopes."  *Id.*

According to the '159 Patent, as of the year 2000, "inertial trackers ha[d] not been used in applications which require tracking motion relative to a *moving* platform."  *Id.* at Abstract (emphasis added).  Instead, the inventors assert that inertial trackers had only been used for tracking motion relative to a "fixed" or stationary base.  *Id.*

As explained in the "Summary of the Invention," the '159 Patent allegedly improves upon the prior art by showing how to "track[] the motion of an object relative to a moving reference frame."  *Id.* at 1:54–56.  The system described in the patent "includes a first inertial sensor mounted on the tracked object; a second inertial sensor mounted on the moving reference frame; and an element coupled to the first and second inertial sensors and configured to determine an orientation of the object relative to the moving reference frame based on the signals from the first and second inertial sensors."  *Id.* at 1:56–62; *see also* claims 1 and 22.

Crucially, according to the '159 Patent, the alleged motion tracking invention is unique not because of the "inertial sensor" devices mounted on the tracked object and moving reference frames, or the generic "element" configured to track the motion of the object based on signals

---

judicial notice of historical exchange rates).

from these sensors.  Instead, the inventors claim to have derived a series of new mathematical

formulae—based on Newtonian principles of motion—for performing the tracking.

For example, in the "Background of the Invention," the inventors recognize that by the

time of the patent's filing in 2000, inertial trackers (which contain gyroscopes and linear

accelerometers) had already been "successfully applied to a wide range of HMD [head mounted

displays] applications." *Id.* at 1:10–17.  Moreover, such trackers had gained "widespread

acceptance as a high-performance, robust and cost-effective alternatives to magnetic, optical and

acoustic tracking systems." *Id.*

Having provided this background, the inventors explain their alleged invention in section

1, starting in column 3, titled "Derivation of Kinematics":

- First, in section 1.1, the inventors discuss well-known kinematics equations used for

  performing "Inertial Tracking Relative to [a] Fixed Platform." *Id.* at 3:27–4:9.  This

  section contains equations used to "keep track of orientation, velocity and position"

  of a tracked object "with respect to an inertially fixed navigation frame." *Id.*  For

  example, these equations allow a system to "track the pose of a body b, with respect

  to an inertially fixed navigation frame, n." *Id.* at 3:27–29.

- Second, in section 1.2, the inventors review well-known "basic equations of terrestrial

  navigation" for "Inertial Tracking Relative to [the] Rotating Earth."  These equations

  allow "track[ing] an airplane relative to the n[avigation]-frame, which itself is moving

  relative to the inertial reference frame," that "has its origin at the center of the earth."

  *Id.* at 4:52–54, 4:17–19.  These equations are relevant to the claimed invention

  "primarily as a source of inspiration for the derivation in the following section, which

deals with a similar problem of tracking a moving body relative to another moving body." *Id.* at 4:10–15.

- Third, in section 1.3, the inventors reveal their alleged invention—"Inertial Tracking Relative to an Arbitrary Maneuvering Platform." *Id.* at 5:60–8:55.  The inventors candidly confess that they arrive at their discovery by "borrowing the mathematics that an inertial navigation system uses to track an airplane relative to a rotating earth, as outlined in the previous section." *Id.* at 5:63–65.  They then disclose five mathematic "modifications" to the equations from section 1.2 to account for the fact that "the platform motion is more dynamic and unpredictable than the earth's rotation."  For example, in the previous section, motion was tracked relative to the rotating earth, such that the angular rate vector $\omega_{in}^{n}$ could be calculated "based on the known constant earth rotation and latitude." *Id.* at 6:1–2.  Now that the reference frame is not the consistently rotating earth, but instead a dynamically moving object (like a flying airplane), these modified calculations require one to "attach a reference IMU [inertial measurement unit] to the [moving] platform and use its gyros to measure $\omega_{in}^{n}$ [an angular rate vector]." *Id.* at 6:1–4.

The inventors disclose equation (10) as the "complete navigation equation" of the invention, "which can be integrated using just data available from the two IMUs"—i.e., one unit on the object being tracked (e.g., the helmet), and one unit on the moving reference frame (e.g., the aircraft). *Id.* at 8:14–17.  This purported invention is nothing more than a fundamental law of nature based on the laws of motion:

$$\dot{v}_{nb}{}^n = C_b{}^n f_{ib}{}^b - \dot{\omega}_{in}{}^n \times r_{nb}{}^n - 2(\omega_{in}{}^n \times v_{nb}{}^n) - \omega_{in}{}^n \times (\omega_{in}{}^n \times r_{nb}{}^n) - f_{in}{}^n \qquad (10)$$

$$\dot{C}_b{}^n = C_b{}^n S(\omega_{ib}{}^b - C_n{}^b \omega_{in}{}^n) \qquad (11)$$

$$\dot{r}_{nb}{}^n = v_{nb}{}^n \qquad (12)$$

*Id.* at 8:4–17.

As formidable as these equations appear, the inventors explain that all that is needed to apply the equation is to gather data regarding the forces acting on the object being tracked ($f_{ib}^b$ and $\omega_{ib}^b$) and on the moving reference frame ($f_{in}^n$ and $\omega_{in}^n$). *Id.* at 8:14–17. Once those forces are measured by standard sensors, the position of the object is "obtained by integrating [equation (12)]," and the orientation (or rotation) of the object "comes from integrating [equation (11)]." *Id.* at 8:9, 8:6. In other words, plug in the numbers and solve the equations.

The final section, Section 2, describes "Simulation Results" using the inventors' purportedly new navigation equation. The result of the simulation, according to the inventors, is to "confirm that the kinematic algorithms really work to extract only the relative motion," and that "the relative navigation equations derived in Section 1.3 are correct." *Id.* at 11:21–27.

At bottom, the '159 Patent claims to have derived a new set of mathematical formulae, based on fundamental laws of physics, to perform inertial tracking of an object relative to a moving reference frame. Nowhere in the patent is there any disclosure of new and improved sensors, hardware, or any other equipment to perform this tracking. To the contrary, the inventors acknowledge that their invention can be used with existing equipment, and that "the basic concept is applicable with any other type of aiding measurements for the inertial sensors." *Id.* at 11:42–43.

II.     **LEGAL STANDARD**

A.     **A Patent May Not Claim Abstract Ideas Without an "Inventive Concept."**

Section 101 of the Patent Act defines subject matter eligibility.  In interpreting Section 101, the Supreme Court has recognized three categories of subject matter that cannot be patented: "laws of nature, physical phenomena, and abstract ideas." *Bilski v. Kappos*, 561 U.S. 593, 601 (2010) (citation and internal quotation marks omitted). The fundamental concern underlying these limitations is that "[l]aws of nature, natural phenomena, and abstract ideas are the basic tools of scientific and technical work."  *Alice*, 134 S. Ct. at 2354 (citation and internal quotation marks omitted).  "[M]onopolization of those tools through the grant of a patent might tend to impede innovation more than it would tend to promote it."  *Id.* (citation and internal quotation marks omitted).

In *Alice*, the Supreme Court defined a two-part test for determining whether a claim is directed to an unpatentable concept.  134 S. Ct. 2347.  First, a court must determine whether the patent claims at issue are directed to an abstract idea, law of nature, or natural phenomena.  *Id.* at 2355.  Second, a court must "consider the elements of each claim both individually and as an ordered combination to determine whether the additional elements transform the nature of the claim into a patent-eligible application."  *Id.* (citation and internal quotation marks omitted). This second prong is referred to as the search for an "inventive concept" and requires that "the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself."  *Id.* (citation and internal quotation marks omitted).

The Supreme Court has stressed that "conventional steps, specified at a high level of generality" do not reflect an "inventive concept." *Id.* at 2357. (citations and internal quotation marks omitted).  Similarly, reciting "generic computer components configured to implement [an abstract] idea" is not an "inventive concept."  *Id.* at 2360.

**B.  A Court May Grant Judgment On The Pleadings For Ineligible Subject Matter, Without Engaging In Claim Construction Proceedings.**

Rule 12(c) of the Rules of the Court of Federal Claims ("RCFC") provides that "[a]fter the pleadings are closed – but early enough not to delay trial – a party may move for judgment on the pleadings."  RCFC 12.[4]

"[W]hether the asserted claims . . . are invalid for failure to claim statutory subject matter under 35 U.S.C. § 101, is a question of law."  *In re Comiskey*, 554 F.3d 967, 975 (Fed. Cir. 2009). (citation and internal quotation marks omitted).  Further, invalidity under Section 101 is a "threshold test." *Bilski*, 561 U.S. at 601–02.[5]  Courts, particularly after the recent *Alice* decision, have been routinely granting judgment on the pleadings under Federal Rule Civil Procedure 12 where asserted patents have been found to be invalid under Section 101 for claiming ineligible subject matter.[6]

---

[4] Because Rule 12(c) is written to track the language of its counterpart in the Federal Rules of Civil Procedures, the Court often looks to cases applying the relevant Federal Rules of Civil Procedures to interpret its own rules.  *See, e.g.*, *Demodulation, Inc. v. United States*, 114 Fed. Cl. 655, 657 (2014); *Barnes v. United States*, 68 Fed.Cl. 492, 494 n. 1 (2005); *see also* RCFC 12, Rules Committee Notes, 2010 Amendment.

[5] Consistently, Elbit has filed concurrently a motion to stay the case pending a resolution of this Motion, as it would be inefficient for the Court or the parties to devote resources to this case until the threshold inquiry of whether TVI's '159 Patent is directed to ineligible subject matter is resolved.

[6] *See, e.g.*, *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709 (Fed. Cir. 2014) (affirming district court's grant of 12(b)(6) motion to dismiss based on Section 101); *buySAFE, Inc. v. Google, Inc.*, 765 F. 3d 1350, 1352 (Fed. Cir. 2014) (affirming district court's grant of a motion for judgment on the pleadings based on Section 101); *Content Extraction & Transmission LLC v. Wells Fargo Bank, N.A.*, 776 F.3d 1343, 1356-57 (Fed. Cir. 2014) (affirming district court's grant of a motion to dismiss based on a Section 101 analysis); *In re TLI Commc'ns LLC Patent Litig.*, No. 1:14md2534, 2015 WL 627858 (E.D.V.A. Feb. 6, 2015) (granting motion to dismiss because the patent was directed at ineligible subject matter); *Ameritox, Ltd v. Millennium Health , LLC*, No. 13-cv-832-wmc, 2015 WL 728501 (W.D. Wis. Feb. 19, 2015) (dismissing claims because the patented subject matter is not patent eligible); *Money Suite Co. v. 21st Century Ins. & Fin. Servs., Inc.*, No. 13-1748-GMS, 2015 WL 436160 (D. Del. Jan. 27, 2015) (granting motion to dismiss because the patent covered patent ineligible subject matter); *Eclipse IP LLC v. McKinley Equip. Corp.*, No. CV 14-154-GW, Dkt. No. 50, at 17 (C.D. Cal. Sept. 4, 2014) (granting motion to dismiss on the pleadings because the patents at issue "fail to satisfy 35 U.S.C. § 101");

Courts need not wait for formal claim construction before ruling on subject matter eligibility. *See, e.g., Bancorp Servs., L.L.C. v. Sun Life Assurance Co. of Canada*, 687 F.3d 1266, 1273 (Fed. Cir. 2012) (affirming that there is no "bright line rule requiring district courts to construe claims before determining subject matter eligibility" and noting that in *Bilski* "the Supreme Court 'found subject matter ineligible for patent protection without claim construction'" (citations and alteration omitted)).[7] Indeed, "because eligibility is a 'coarse'

_____

*Gametek LLC v. Zynga, Inc.*, No. CV 13-2546RS, 2014 WL 1665090, at * 1 (N.D. Cal. Apr. 25, 2014) (granting judgment on the pleadings because the patent at issue "claims an unpatentable abstract idea"); *Clear with Computers, LLC v. Dick's Sporting Goods, Inc.*, 21 F. Supp. 3d 758, 768 (E.D. Tex. 2014) (granting judgment on the pleadings because the "claims are directed to an ineligible abstract idea and thus invalid under 35 U.S.C. § 101"); *Cardpool, Inc. v. Plastic Jungle, Inc.,* No. C 12-04182 WHA, 2013 WL 245026, at *3 (N.D. Cal. Jan. 22, 2013) ("[t]here is no authority for the proposition that a patent may not be deemed ineligible subject matter on a motion to dismiss"); *Vacation Exch.e, LLC v. Wyndham Exch. & Rentals, Inc.*, No. CV-12-04229-RGK, Dkt. No. 27, at 1 (C.D. Cal. Sept. 18, 2012) (granting motion to dismiss on the pleadings because the patent at issue "does not cover patentable subject matter"); *OIP Technologies, Inc. v. Amazon.com, Inc.*, No. C12-1233 EMC, 2012 WL 3985118, at *5 (N.D. Cal. Sept. 11, 2012) ("the procedural posture of this case does not render Amazon's [12(b)(6)] motion premature").

[7] *See also Content Extraction & Transmission LLC,* 776 F.3d at 1359 ("Although the determination of patent eligibility requires a full understanding of the basic character of the claimed subject matter, claim construction is not an inviolable prerequisite to a validity determination under § 101."); *Eclipse IP LLC*, No. CV 14-154-GW, Dkt. No. 50, at 9 ("Here, based on the substance of the parties arguments and the content of the patents, this Court would find that neither separate claim construction proceedings nor further development of the factual record are required before addressing the § 101 issue"); *CMG Fin.l Servs., Inc. v. Pac. Trust Bank,* No. CV 11-10344-PSG, Dkt. 164, at 11 (C.D. Cal. Aug. 29, 2014) ("Claim construction would not assist the Court in resolving the § 101 issue"); *Lumen View Tech. LLC v. Findthebest.com, Inc.*, 984 F. Supp. 2d 189, 205 (S.D.N.Y. 2013) (granting judgment on the pleadings because "[t]he claimed process elements of Claim 1 are straightforward. No components are opaque such that claim construction would be necessary to flush out its contours"); *Uniloc USA, Inc. v. Rackspace Hosting, Inc.*, 18 F. Supp. 3d 831, 834 (E.D. Tex. 2013) ("Section 101 questions of patentability may be resolved before claim construction"); *Vacation Exch., LLC,* No. CV 12-04229-RGK Dkt. No. 27,at 2–3 ("where claim construction is not required for a full understanding of the basic character of the claimed subject matter, a district court may resolve patentable subject matter eligibility on a motion to dismiss"); *OIP Technologies, Inc.*, 2012 WL 3985118, at *5 (the Federal Circuit "has never set forth a bright line rule requiring district courts to construe claims before determining subject matter eligibility").

gauge of the suitability of broad subject matter categories for patent protection," *Research Corp. Techs., Inc. v. Microsoft Corp.*, 627 F.3d 859, 869 (Fed. Cir. 2010), claim construction may not always be necessary.

As Judge Mayer has recently commented, "[f]rom a practical perspective, addressing section 101 at the outset of litigation will have a number of salutary effects." *Ultramercial*, 772 F.3d at 718–19 (Mayer, J., concurring). "First, it will conserve scarce judicial resources. Failure to recite statutory subject matter is the sort of basic deficiency that can, and should, be exposed at the point of minimum expenditure of time and money by the parties and the court." *Id.* (citation omitted). "Second, resolving subject matter eligibility at the outset provides a bulwark against vexatious infringement suits." *Id.* at 719. "Finally, and most importantly, turning to section 101 at the outset protects the public. . . . Subject matter eligibility challenges provide the most efficient and effective tool for clearing the patent thicket, weeding out those patents that stifle innovation and transgress the public domain." *Id.*[8]

In the present case, an invalidity analysis under Section 101 does not require any factual development or claim construction, because no construction would dictate a different analysis regarding patentable subject matter. Therefore, the present motion should be resolved at this time, as it would conserve the parties' resources and further judicial economy.

## III.   THE CLAIMS OF THE '159 PATENT ARE INVALID UNDER SECTION 101

### A.   The Independent Claims Are Directed To A Patent-Ineligible Mathematical Formula, With No Inventive Concept

#### 1.   *The Claims Fail* **Alice** *Step One Because They Are Drawn On Their Face To An Abstract Formula*

---

[8] Judge Mayer has also observed that Section 101 is a threshold issue whose resolution must precede other issues—"[u]ntil it is determined that claimed subject matter is even *eligible* for patent protection, a court has no warrant to consider subordinate validity issues." *I/P Engine, Inc. v. AOL, Inc.*, 576 F. App'x 982, 995 (Fed. Cir. 2014) (Mayer, J. concurring).

A court must first evaluate the claims "[o]n their face" to determine the "concept" to which the claims are "drawn," and determine whether they are directed to patent-ineligible "laws of nature, natural phenomena, and abstract ideas."  *Alice*, 134 S. Ct. at 2356, 2359 (citation and internal quotation marks omitted).

The '159 Patent has two independent claims: 1 (a system claim) and 22 (a method claim).  First examining claim 22, it is drawn on its face to a law of nature, namely, the mathematical equations that govern an object's orientation relative to a moving reference frame.

> 22. A method comprising determining an orientation of an object relative to a moving reference frame based on signals from two inertial sensors mounted respectively on the object and on the moving reference frame.

'159 Patent at 13:24–27.

The '159 Patent describes how to perform the claimed step of "determining an orientation."  The orientation is represented mathematically by "orientation matrix $C_b^n$,"which satisfies the following equation (*id.* at 8:6–8):

$$\dot{C}_b{}^n = C_b{}^n S(\omega_{ib}{}^b - C_n{}^b \omega_{in}{}^n) \tag{11}$$

According to the patent, the orientation is calculated by plugging in the values of the angular velocities ($\omega_{ib}^b$ and $\omega_{in}^n$) measured by the sensors and solving equation (11).  '159 Patent at 8:5–8.   The claimed method is nothing more than an instruction to apply equation (11).  Therefore, claim 22 is drawn to the abstract law of nature described by equation (11).  *See DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1256 (Fed. Cir. 2014) ("mathematical algorithms . . . are abstract ideas.").

Independent system claim 1 is fundamentally drawn to the same orientation-determining equation, and fares no better.[9]  It recites the same generic "inertial sensor" equipment, in addition to a generic computing "element" for performing the orientation calculation:

> 1. A system for tracking the motion of an object relative to a moving reference frame, comprising:
>
> a first inertial sensor mounted on the tracked object;
>
> a second inertial sensor mounted on the moving reference frame;
>
> and an element adapted to receive signals from said first and second inertial sensors and configured to determine an orientation of the object relative to the moving reference frame based on the signals received from the first and second inertial sensors

'159 Patent at 11:50–59.  As noted above, in deriving the mathematical equations that are at the heart of claims 1 and 22, the inventors admit that their work is simply an extension of well-established natural laws, noting that they simply "borrow[ed] the mathematics"—with minor modifications—that had been developed previously for tracking an object relative to a stationary frame or the moving earth.  *Id.* at  5:53.[10]

Assuming, for purposes of this motion, that the '159 Patent's inventors did indeed discover equations (10) through (12), the mere fact of discovery does not transform the equations

---

[9] The Supreme Court has "long warn[ed]. . . against interpreting § 101 in ways that make patent eligibility depend simply on the draftsman's art."  *Alice*, 134 S. Ct. at 2360 (citations and internal quotation marks omitted).  A system claim should be treated the same as a method claim where there is no "material difference" between the categories of claims.  *Bancorp*, 687 F.3d at 1277; *see also Accenture*, *Global Servs., GmbH v. Guidewire Software, Inc.*, 728 F.3d 1336, 1341 (Fed. Cir. 2013) (noting that a majority of the Federal Circuit judges have held that "system claims that closely track method claims and are grounded by the same meaningful limitations will generally rise and fall together") (citing *CLS Bank Int'l v. Alice Corp.* Pty. Ltd., 717 F.3d 1269, 1274 n.1 (Fed. Cir.) (plurality opinion), *cert granted*, 134 S. Ct. 734 (2013), *aff'd*, 134 S. Ct. 2347 (2014)), *cert. denied*, 134 S. Ct. 2871 (2014)).

[10] Likewise, the inventors simply use a generic computer processor for "determining" (calculating) the object's orientation relative to a moving reference frame using those equations.  *See, e.g.*, '159 Patent at 8:60–9:2, Fig. 4 (referring to the "processor unit" that "gathers the data from the various sensors" and performs a series of calculations to arrive at the motion of the tracked object.

from unpatentable mathematical expressions of Newton's laws of motion into patentable subject matter.[11]  TVI is no more entitled to a patent on such equations than Newton or Einstein would be to their celebrated discoveries.  *See Diamond v. Chakrabarty*, 447 U.S. 303, 309 (1980) ("Einstein could not patent his celebrated law that $E=mc^2$; nor could Newton have patented the law of gravity. Such discoveries are manifestations of . . . nature, free to all men and reserved exclusively to none.") (citation and internal quotation marks omitted); *Parker v. Flook*, 437 U.S. 584, 591 ("Whether the algorithm was in fact known or unknown at the time of the claimed invention . . . it is treated as though it were a familiar part of the prior art.").  In the same way that Einstein would not be entitled to a patent on a method for measuring the energy of an object (E) by using a conventional digital scale to measure the mass of the object (m) and multiplying that input by the known speed of light times itself ($c^2$), the inventors of the '159 Patent should not be entitled to preempt the observation of Newton's equations of motion with conventional inertial sensors.

Thus, both claim 22 and claim 1 improperly seek to monopolize the abstract physical laws that the inventors claims to have discovered.  *Gottschalk v. Benson*, 409 U.S. 63, 67 (1972) ("Phenomena of nature, though just discovered, mental processes, and abstract intellectual concepts are not patentable, as they are the basic tools of scientific and technological work.").  The operative step of both claims is the mathematical process of "determin[ing] an orientation of an object."  Such a calculation is the epitome of an "abstract idea."  Therefore, the second step of the *Alice* test must be considered.

### 2.      *The Claims Fail* Alice *Step Two Because They Recite Routine, Conventional Equipment For Implementing The Abstract Idea*

---

[11] Defendants note that the mathematical equations disclosed in the '159 Patent are not novel. The laws of motion that the inventors claim to have discovered are immediate consequences of Newton's laws of motion and were well known in the art.

Under the second step of the *Alice* analysis, the Court must consider whether the claims contain an "inventive concept" capable of transforming the relative orientation equations into a patent-eligible application of those equations.  *See Alice*, 134 S. Ct. at 2355.

Other than the inertial orientation calculations recited in the '159 patent's independent claims, the only structures identified are the generic "inertial sensors" (claims 1, 22) that gather data for feeding into the equations, and the generic computing "element" (claim 1) for performing the calculations.  The question, therefore, is whether this recitation of generic hardware—whose only purpose is to gather and process data for applying an abstract algorithm—can transform a patent-ineligible abstract idea into a patent-eligible invention.   As discussed below, the answer is "no."

In *Parker v. Flook*, 437 U.S. 584 (1978), the Court invalidated a patent claiming a method for updating "alarm limits" for process variables involved in the catalytic conversion process.  *Id.* at 585.  The claimed method had three steps: an initial step of gathering data to measure the present value of a process variable (e.g., temperature), an intermediate step of using a mathematical algorithm to calculate an updated "alarm limit" value, and a final step in which the system's "alarm limit" is adjusted to the updated value.  *Id.* at 585–86.  "The only difference between the conventional methods of changing alarm limits and that described in [the] application . . . [was] the mathematical algorithm or formula."  *Id.* at 585–87.

In finding the claims unpatentable, the *Flook* Court noted that "the novelty of the mathematical algorithm is not a determining factor [in the patentability analysis] at all."  *Id.* at 591.  Rather, the question was whether there was "some other inventive concept in [the algorithm's] application."  *Id.* at 594.  Examining the remainder of the claims, the Court found it critical that no other aspect of the alleged invention was even purported to be inventive.  *Id.*

("The chemical processes involved in catalytic conversion of hydrocarbons are well known, as are the practice of monitoring the chemical process variables, the use of alarm limits to trigger alarms, the notion that alarm limit values must be recomputed and readjusted, and the use of computers for "automatic monitoring-alarming.").  The Court also rejected the patentee's argument that adjustment of the "alarm limit" to the figure computed according to the formula made his process distinct from the bare algorithm: "The notion that post-solution activity, no matter how conventional or obvious in itself, can transform an unpatentable principle into a patentable process exalts form over substance."  *Id.* at 590.  Indeed, any "competent draftsman could attach some form of post-solution activity to almost any mathematical formula."  *Id.* "[T]he Pythagorean theorem would not have been patentable, or partially patentable, because a patent application contained a final step indicating that the formula, when solved, could be usefully applied to existing surveying techniques."  *Id.*

Following *Flook*'s lead, the Federal Circuit has repeatedly held that "adding a data-gathering step to an algorithm is insufficient to convert that algorithm into a patent-eligible process."  *In re Bilski*, 545 F.3d 943, 963 (Fed. Cir. 2008) (citing *In re Grams*, 888 F.2d 835, 840 (Fed. Cir. 1989)), *aff'd*, 561 U.S. 593 (2010); *In re Meyer*, 688 F.2d 789, 794 (C.C.P.A. 1982)).[12] *See also In re Schrader*, 22 F.3d 290, 294 (Fed. Cir. 1994).  For example, the patent in *Grams* claimed "[a] method of diagnosing an abnormal condition in an individual" by combining the data from multiple clinical tests and analyzing the data to determine the cause of the abnormality.

---

[12] Although the Supreme Court disagreed with some aspects of the Federal Circuit's decision in *Bilski*, it reaffirmed the importance of identifying and discarding extra-solution activity when considering whether a patent is drawn to patentable subject matter.  *See Bilski v. Kappos*, 561 U.S. 593, 610–11 (2010) ("*Flook* stands for the proposition that the prohibition against patenting abstract ideas 'cannot be circumvented by attempting to limit the use of the formula to a particular technological environment' or adding 'insignificant postsolution activity.'" (citation omitted)).

*In re Grams*, 888 F.2d at 836–37.  The Federal Circuit held that the patent improperly claimed an abstract method of data analysis, notwithstanding the fact that the first step in the method was to "perform [a] plurality of clinical laboratory tests on the individual to measure the values of the set of parameters."  *Id.*  The court recognized that every data analysis algorithm must be provided with data to analyze.  *Id.* at 839–40.  "The presence of a physical step in the claim to derive data for the algorithm will not render the claim statutory."  *Id.* at 840.  Because "the only physical step involves merely gathering data for the algorithm," the court concluded that "applicants are, in essence, claiming the mathematical algorithm," such that the claims were rendered invalid.  *Id.* at 839–40.

By contrast, in *Diamond v. Diehr*, 450 U.S. 175 (1981), the Court upheld a patent claiming a "process for curing synthetic rubber which includes in several of its steps the use of a mathematical formula and a programmed digital computer."  *Id.* at 177.  Although Diehr's claims involved a well-known mathematical formula (the Arrhenius equation), the Court reasoned that his claims "do not seek to pre-empt the use of that equation.  Rather, they seek only to foreclose from others the use of that equation in conjunction with all of the other steps in their claimed process," such as "installing rubber in a press, closing the mold, constantly determining the temperature of the mold, constantly recalculating the appropriate cure time through the use of the formula and a digital computer, and automatically opening the press at the proper time."  *Id.* at 187.  These additional steps rendered the claims patentable as "an *application* of a law of nature or mathematical formula to a known structure or process,"—embodied in claims that the Court noted "involve the transformation of an article, in this case raw, uncured synthetic rubber, into a different state or thing."  *Id.* at 184, 187–88.  "Industrial processes such as this are the types which have historically been eligible to receive the protection of our patent laws."  *Id.*  In

other words, the equations in *Diehr* for reaction speed were not used merely to determine time to completion of a process (which would effectively preempt use of the equation itself), but were instead used to control the steps of a manufacturing process that resulted in a new thing.

By contrast, the equations of the '159 Patent are used to determine (or calculate) relative position—without more. Accordingly, the independent claims of the '159 Patent do not contain an inventive concept. As in *Flook* and *Grams*, TVI's claims are "in essence, claiming [a] mathematical algorithm," because they recite nothing more than data gathering steps for the algorithm using conventional equipment. Unlike in *Diehr*, TVI's claims do not recite an industrial application of a physical principle that physically transforms an article from one state to another. To the contrary, the claims in suit recite nothing more than instructions to apply mathematical equations for calculating the orientation of a moving object using conventional inertial sensors.

Tellingly, throughout the specification, the inventors repeatedly refer to their alleged invention in abstract mathematical terms, describing their invention as an "algorithm." *See* '159 Patent at 10:10–12 ("A simulation has been written to evaluate the performance of the proposed algorithm."); *see also id.* at 9:16 (referring to the inventors' "enhanced kinematic integration algorithm"). And the inventors derive their algorithm using nothing more than basic principles of physics and elementary mathematics. *See* '159 Patent at 5:62–65 ("We track a person's head relative to a maneuvering platform by borrowing the mathematics that an inertial navigation system uses to track an airplane relative to a rotating earth, as outlined in the previous section.").

Moreover, the claimed "inertial sensor[s]" cannot transform the claims into a specific, patentable implementation because they are entirely generic. Indeed, the '159 patent explains that a wide variety of such sensors can be used, including—but not limited to—"angular

accelerometers, angular rate sensors, and angular position gryoscopes." '159 patent at 1:63:67; *id.* at claim 2. In short, any type of sensor that provides the data required by the equations ($\omega_{ib}^{b}$ and $\omega_{in}^{n}$) will suffice. Just as the patentee in *Flook* acknowledged that it was well known to gather "alarm limit" data, the '159 Patent acknowledges that various types of sensors for gathering inertial measurements were well known in the art. '159 Patent at Abstract (noting that inertial sensors already "have been successfully applied to a wide range of head mounted display (HMD) applications."). Therefore, the use of "inertial sensors" is not an inventive concept that meaningfully limits the scope of the claims. To the contrary, by reciting generic inertial sensors, the patent reinforces that the real "invention" is an unpatentable set of kinematic equations.

The recitation in claim 1 of an "element adapted to receive signals from said first and second inertial sensors and configured to determine an orientation" likewise fails to convert the claimed abstract idea into a patentable invention. The "element" of claim 1 is nothing more than a generic computer. *See* '159 Patent, 8:58–66 (using a "rack-mount processor unit" which "gathers the data from the various sensors, performs integration and sensor fusion algorithms, and outputs the cooked 6-DOF data to a host by serial port"). "[T]he mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention." *Alice*, 134 S. Ct. at 2358

As the Supreme Court has recently explained, an unpatentable concept cannot be transformed into a patent-eligible application simply by stating the concept and "adding the words 'apply it.'" *Alice*, 134 S. Ct. at 2358. Instead, there must be "additional features" that "provide practical assurance that the process is more than a drafting effort designed to monopolize the [abstract idea] itself." *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1297 (2012). As the Court has further explained, "[g]iven the ubiquity of

computers, . . . wholly generic computer implementation is not generally the sort of 'additional

featur[e]'" that can provide such "practical assurance." *Alice*, 134 S. Ct. at 2358.

TVI's independent claims therefore do nothing more than instruct the practitioner to

implement an abstract mathematical formula using generic, unspecified hardware for data

collection and computation.  Because "[p]urely conventional or obvious pre-solution activity is

normally not sufficient to transform an unpatentable law of nature into a patent-eligible

application of such a law," these claims are invalid under § 101.  *Mayo*, 132 S. Ct. at 1298

(citation omitted).

### B.      The Numerous Dependent Claims Are Also Patent-Ineligible

The asserted dependent claims of the '159 Patent—claims 2–5, 11–13, and 20 (system

claims) and 23–26, 32–34, and 41 (method claim counterparts)[13]—provide a patent draftsman's

embellishments in which details regarding data gathering and processing are specified.  But the

law clearly compels the conclusion that these details do not meaningfully limit the claimed

subject matter beyond the abstract idea at the heart of the invention—an equation for inertial

tracking of an object relative to a moving reference frame.  Therefore, as discussed below, the

dependent claims are invalid under Section 101 as well.[14]

Claims 2 and 23.  These claims further specify that "the first and second inertial sensors

[of claims 1 and 22] each comprises three angular inertial sensors selected from the set of

angular accelerometers, angular rate sensors, and angular position gyroscopes."  Neither the

---

[13] In its March 20, 2015 disclosure of asserted claims, TVI, pursuant to the Scheduling Order, identified claims 1–5, 11–13, 20, 22–26, 32–34, and 41 as the claims of the '159 Patent that are allegedly infringed.  For the sake of judicial economy, this motion does not address claims not alleged by TVI to be infringed.  If necessary, however, Defendants are prepared to demonstrate at the appropriate juncture why, for similar reasons as for the asserted claims, these unasserted claims are also invalid under Section 101.

[14] As before, because the system and method claims substantively identical, they rise and fall together.  *See Alice*, 134 S. Ct. at 2360 (analyzing system claims as "no different from the method claims in substance").

claims nor the specification of the '159 Patent provide any description of the specific structure of these conventional data gathering instruments. Most importantly, with regard to the second step of the *Alice* test, this equipment does not provide an "inventive concept" because the inventors nowhere claim to have invented new and improved versions of these devices that gather and feed data into the inventors' inertial tracking equation. Therefore, claims 2 and 23 fail under § 101. *See Alice*, 134 S. Ct. at 2357 ("Simply appending conventional steps, specified at a high level of generality," is not "enough" to supply an "inventive concept"); *see also In re Grams*, 888 F.2d at 840 (step of "deriv[ing] data for the algorithm will not render the claim statutory"); *In re Meyer*, 688 F.2d at 794 ("[data-gathering] step[s] cannot make an otherwise nonstatutory claim statutory"); *In re Bilski*, 545 F.3d at 963("[T]he inherent step of gathering data can also fairly be characterized as insignificant extra-solution activity.").

Claims 3 and 24. These claims further specify that "the angular inertial sensors [of claims 2 and 23] comprise angular rate sensors, and the orientation of the object relative to the moving reference frame is determined by integrating a relative angular rate signal determined from the angular rate signals measured by the first and second inertial sensors." Again, these claims add no patent-eligible "inventive concept." As explained above, adding a well-known, prior art sensor solely to perform a data-gathering step is not an "inventive concept." Likewise, specifying a particular mathematical algorithm, "integrating a relative angular rate signal," for solving the kinematic equations does not make the underlying equations patentable. *See, e.g.*, *DDR Holdings*, 773 F.3d at 1256. Because a mathematical formula constitutes a classically unpatentable concept, these claims fail under Section 101.

Claims 4 and 25. These claims further specify a generic "non-inertial measuring subsystem" for "making independent measurements" "related to the orientation of the object

relative to the moving reference frame," and for "using those measurements for correcting drift that may occur in the inertial orientation integration."  The additional limitations of these claims cannot provide an "inventive concept" because the inventors admit in the specification that such non-inertial drift correcting subsystems exist in the prior art. *See* '159 Patent at 4:5–9 ("The drift that results from using such low-performance gyros and neglecting the effects of earth rotation must be frequently corrected by other means, ultrasonic position sensors and a drift correction Extended Kalman Filter in the case of the IS-600.").  Indeed, the inventors specify the previously existing InterSense "IS-600 Mark 2" as an example of a "motion tracking system" that includes such a drift correction subsystem for processing "correction values generated by the extended Kalman filter error estimator unit 485." *Id.* at 8:58–9:9.  Again, the inventors make no claim to have invented any new equipment of the type recited in these claims.  Moreover, the claimed "drift correction" is simply another mathematical algorithm.  Thus, there is no "inventive concept" and these claims are invalid under Section 101.

Claims 5 and 26.  These claims further specify that "the non-inertial measuring subsystem [of claims 4 and 25] is selected from the set of optical, acoustic, magnetic, RF, or electromagnetic technologies."  Again, there can be no distinguishing "inventive concept" in these claims because the inventors acknowledge that such non-inertial systems were widely in use in aircraft at the time of their alleged invention.  '159 Patent at 11:40–46 ("Although the results have been illustrated using an acoustic/inertial hybrid tracking system configuration based on the InterSense IS-600, the basic concept is equally applicable with any other type of aiding measurements for the inertial sensors, including the magnetic or optical tracking systems that are currently used in many cockpit helmet-tracking applications.").

Claims 11 and 32. These claims further specify that "the first and second inertial sensors each further comprises three linear accelerometers." The inventors of the '159 Patent admit that these devices were in the prior art, by referring to "gyros and accelerometers," which are used to track orientation and position (respectively) in Section 1.2 of the specification dealing with "inertial tracking relative to rotating earth." *See* '159 Patent at 5:5:52–55. Nowhere in the specification do the inventors claim to have disclosed a new and improved linear accelerometer. As with the other generic data-gathering sensor equipment recited in other dependent claims, the recitation of "linear accelerometers" in claims 11 and 32 lends no "inventive concept."

Claims 12 and 33. Claim 33 further specifies "calculating the position of the object relative to the moving reference frame" and claim 12 specifies a generic "element" for doing so. On its face, the position calculation step of these claims is drawn to an unpatentable mathematical algorithm. More specifically, the '159 Patent states that the position of the object is determined by the equation:

$$\dot{r}_{nb}{}^{n} = v_{nb}{}^{n} \tag{12}$$

'159 Patent, 8:11–12. The "method" is nothing more than integrating, i.e. solving, the equation. *Id.* Because neither this equation nor a generic "element" for solving the equation can impart patentability under Section 101, these claims are invalid as a matter of law.

Claims 13 and 34. Claim 34 further specifies "double-integrating a relative linear acceleration signal computed from the linear accelerometer signals measured by the first and second inertial sensors," and claim 13 specifies that the "element" of claim 12 does this calculation. For the same reasons as noted above with regard to claims 12 and 33, an integration algorithm with a generic "element" does not provide a sufficient "inventive concept" under *Alice* and other Supreme Court precedent.

Claims 20 and 41.  These claims further specify that "the moving reference frame is associated with a vehicle, and the second inertial sensor comprises a pre-existing inertial measurement unit on a vehicle that was installed for the purpose of navigation."  These claims provide no new "inventive concept" because they merely specify a particular reference frame for a series of inertial tracking equations, along with a generic "inertial sensor" that was, by the very wording of the claims, already installed in prior art vehicles for purpose of navigation.

## IV.     CONCLUSION

The claims of the '159 Patent are invalid because they all claim an abstract law of nature using generic and conventional hardware for data collection and computation.  This is insufficient to transform the law of nature into a patent-eligible invention under 35 U.S.C. § 101.  Defendants therefore respectfully request early resolution of the patent eligibility issue, which will prevent unnecessary expenditure of time and resources by the Court and the parties.

Date:  March 27, 2015                              Respectfully submitted,


*Ranganath T. Sudarshan*

Kurt G. Calia
COVINGTON & BURLING LLP
333 Twin Dolphin Drive
Redwood Shores, CA 94065
Telephone: (650) 632-4700
Facsimile: (650) 632-4800
kcalia@cov.com

Sarah Wilson
Ranganath Sudarshan
Matthew Kudzin
John A. Kelly
Z. Lily Rudy
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001

Telephone: (202) 662-6000
Facsimile: (202) 662-6291
swilson@cov.com
rsudarshan@cov.com
mkudzin@cov.com
jkelly@cov.com
zrudy@cov.com

*Counsel for Elbit Systems of America, LLC*

BENJAMIN C. MIZER
Acting Assistant Attorney General

JOHN J. FARGO
Director

March 27, 2015

*Scott Elder* for Andrew Zager

ANDREW P. ZAGER
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Washington, DC 20530
Telephone:     (202) 514-6169
Facsimile:     (202) 307-0345

*Attorneys for the United States of America*

**CERTIFICATE OF SERVICE**

I hereby certify that on March 27, 2015, pursuant to RCFC 5, 5.3, and Appendix E,

paragraph 12, this document has been filed electronically and all counsel of record will be served

by operation of the Court's electronic filing system.

/s/ Z. Lily Rudy
Z. Lily Rudy
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
Telephone: (202) 662-6000
Facsimile: (202) 662-6291
zrudy@cov.com