# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## NOTICE OF ENTRY OF
## JUDGMENT ACCOMPANIED BY OPINION

OPINION FILED AND JUDGMENT ENTERED: 03/08/2017

The attached opinion announcing the judgment of the court in your case was filed and judgment was entered on the date indicated above. The mandate will be issued in due course.

Information is also provided about petitions for rehearing and suggestions for rehearing en banc. The questions and answers are those frequently asked and answered by the Clerk's Office.

Costs are taxed against the appellee in favor of the appellant under Rule 39. The party entitled to costs is provided a bill of costs form and an instruction sheet with this notice.
The parties are encouraged to stipulate to the costs. A bill of costs will be presumed correct in the absence of a timely filed objection.
Costs are payable to the party awarded costs. If costs are awarded to the government, they should be paid to the Treasurer of the United States. Where costs are awarded against the government, payment should be made to the person(s) designated under the governing statutes, the court's orders, and the parties' written settlement agreements. In cases between private parties, payment should be made to counsel for the party awarded costs or, if the party is not represented by counsel, to the party pro se. Payment of costs should not be sent to the court. Costs should be paid promptly.
If the court also imposed monetary sanctions, they are payable to the opposing party unless the court's opinion provides otherwise. Sanctions should be paid in the same way as costs.

Regarding exhibits and visual aids: Your attention is directed Fed. R. App. P. 34(g) which states that the clerk may destroy or dispose of the exhibits if counsel does not reclaim them within a reasonable time after the clerk gives notice to remove them. (The clerk deems a reasonable time to be 15 days from the date the final mandate is issued.)

FOR THE COURT

/s/ Peter R. Marksteiner
Peter R. Marksteiner
Clerk of Court

15-5150 - Thales Visionix Inc. v. US
United States Court of Federal Claims, Case No. 1:14-cv-00513-TCW

# United States Court of Appeals for the Federal Circuit

_____

**THALES VISIONIX INC.,**
*Plaintiff-Appellant*

v.

**UNITED STATES,**
*Defendant-Appellee*

**ELBIT SYSTEMS OF AMERICA, LLC,**
*Third Party Defendant-Appellee*

_____

2015-5150

_____

Appeal from the United States Court of Federal Claims in No. 1:14-cv-00513-TCW, Judge Thomas C. Wheeler.

_____

Decided: March 8, 2017

_____

MEREDITH MARTIN ADDY, Tabet DiVito & Rothstein, LLC, Chicago, IL, argued for plaintiff-appellant. Also represented by ASHLEY CRETTOL INSALACO, DANIEL I. KONIECZNY.

ANDREW PAUL ZAGER, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellee. Also represented by BENJAMIN C. MIZER, JOHN J. FARGO.

Kurt Calia, Covington & Burling LLP, Redwood Shores, CA, argued for third party defendant-appellee. Also represented by John Arthur Kelly, Matthew Aaron Kudzin, Ranganath Sudarshan, Washington, DC.

Jeffrey A. Lamken, MoloLamken LLP, Washington, DC, for amicus curiae BSA | The Software Alliance. Also represented by Michael Gregory Pattillo, Jr.

_____

Before Moore, Wallach, and Stoll, *Circuit Judges*.

Moore, *Circuit Judge*.

Thales Visionix, Inc. ("TVI") appeals from the U.S. Court of Federal Claims ("Claims Court") judgment on the pleadings holding that claims 1–5, 11–13, 20, 22–26, 32–34, and 41 of U.S. Patent No. 6,474,159 ("'159 patent") are directed to patent-ineligible subject matter. *Thales Visionix, Inc. v. United States*, 122 Fed. Cl. 245, 257 (2015). We *reverse* the Claims Court's determination for all claims and *remand* for further proceedings.

## Background

The '159 patent discloses an inertial tracking system for tracking the motion of an object relative to a moving reference frame. '159 patent at 1:54–56. Inertial sensors, such as accelerometers and gyroscopes, measure the specific forces associated with changes in a sensor's position and orientation relative to a known starting position. Such sensors are used in a wide variety of applications, including aircraft navigation and virtual reality simulations. When mounted on a moving object, inertial sensors can calculate the position, orientation, and velocity of the object in 3-dimensional space, based on a specified starting point, without the need for any other external information. Because small errors in the measurement of

acceleration and angular velocity translate to large errors in position over time, inertial systems generally include at least one other type of sensor, such as an optical or magnetic sensor, to intermittently correct these errors that compound over time.

The patent disclosure recognized that conventional solutions for tracking inertial motion of an object on a moving platform were flawed because both object- and platform-based inertial sensors measured motion relative to earth, and the error-correcting sensors on the tracked object measured position relative to the moving platform. *Id.* at 1:23–42. Attempting to fuse this data produced inconsistent position information when the moving platform accelerated or turned. *Id.*

The inertial sensors disclosed in the '159 patent do not use the conventional approach of measuring inertial changes with respect to the earth. *Id.* at 7:12–23. Instead, the platform (e.g., vehicle) inertial sensors directly measure the gravitational field in the platform frame. *Id.* at 7:12–49, fig. 3D. The object (e.g., helmet) inertial sensors then calculate position information relative to the frame of the moving platform. *Id.* at 7:41–67, 8:1–17, fig. 3D. By changing the reference frame, one can track the position and orientation of the object within the moving platform without input from a vehicle attitude reference system or calculating orientation or position of the moving platform itself. *Id.* at 8:34–41.

There are multiple advantages of the disclosed system over the prior art. First, it increases the accuracy with which inertial sensors measure the tracked object on the moving frame. *Id.* at 11:31–34. When the moving platform accelerates or turns, the inertial sensor on the platform directly measures the gravitational effect in the moving reference frame and the system therefore requires fewer measured inputs (and fewer points of potential error) to determine the position and orientation of the

4                   THALES VISIONIX INC. v. UNITED STATES

tracked object. *Id.* at 8:34–37. Second, the disclosed system can operate independently, without requiring other hardware on the moving platform that determine the orientation or position of the moving platform itself. *Id.* at 8:34–41. Third, because the whole system is installed on the inside of the moving platform, installation is also simpler than previous inertial systems. *Id.* at 7:5–10.

Claims 1 and 22, the only independent claims,[1] recite:

1. A system for tracking the motion of an object relative to a moving reference frame, comprising:

>   a first inertial sensor mounted on the tracked object;
>
>   a second inertial sensor mounted on the moving reference frame; and
>
>   an element adapted to receive signals from said first and second inertial sensors and configured to determine an orientation of the object relative to the moving reference frame based on the signals received from the first and second inertial sensors.

22. A method comprising determining an orientation of an object relative to a moving reference frame based on signals from two inertial sensors mounted respectively on the object and on the moving reference frame.

---

[1] The parties do not agree to any representative claims, and TVI argues that the Claims Court erred by failing to separately consider the eligibility of dependent claims. Because we hold the independent claims patent eligible, we do not reach this issue.

TVI sued the government and asserted the helmet-mounted display system ("HMDS") in the F-35 Joint Strike Fighter infringes claims 1–5, 11–13, 20, 22–26, 32–34, and 41 of the '159 patent. Elbit Systems of America ("Elbit"), the government subcontractor that produces the HMDS, joined the case as a third-party defendant. The government and Elbit moved for judgment on the pleadings, arguing all asserted claims disclosed patent-ineligible subject matter under 35 U.S.C. § 101 because they claim a law of nature.

The Claims Court granted the defendants' motion for judgment on the pleadings and held all claims directed to patent-ineligible subject matter under 35 U.S.C. § 101. It found the claims (1) are directed to the abstract idea of using laws of nature governing motion to track two objects, and (2) provide no inventive concept beyond the abstract idea. TVI appeals. We have jurisdiction under 28 U.S.C. § 1295(a)(3).

## DISCUSSION

We review a decision from the Claims Court granting judgment on the pleadings de novo. *Cary v. United States*, 552 F.3d 1373, 1376 (Fed. Cir. 2009). We also review a determination that claims are not directed to patent-eligible subject matter de novo. *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1334 (Fed. Cir. 2016).

Section 101 provides that anyone who "invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof" may obtain a patent. 35 U.S.C. § 101. The Supreme Court has repeatedly emphasized that patent protection should not extend to claims that monopolize "the basic tools of scientific and technological work." *Gottschalk v. Benson*, 409 U.S. 63, 67 (1972); *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66, 71 (2012); *Alice Corp. Pty. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2354 (2014). Accordingly, laws of nature, natu-

ral phenomena, and abstract ideas are not patent-eligible subject matter. *Alice*, 134 S. Ct. at 2354.

The Supreme Court's two-part *Alice* framework guides courts in distinguishing between patent claims that impermissibly claim the "building blocks of human ingenuity" and those that "integrate the building blocks into something more." *Id.* (internal quotations omitted). First, we "determine whether the claims at issue are directed to a patent-ineligible concept." *Id.* at 2355. If so, we "examine the elements of the claim to determine whether it contains an 'inventive concept' sufficient to 'transform' the claimed abstract idea into a patent-eligible application." *Id.* at 2357 (quoting *Mayo*, 566 U.S. at 72, 79).

We begin our analysis at *Alice* step one: "whether the claims at issue are directed to a patent-ineligible concept." *Id.* at 2355. While the two steps of the *Alice* framework are related, the "Supreme Court's formulation makes clear that the first-stage filter is a meaningful one, sometimes ending the § 101 inquiry." *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1353 (Fed. Cir. 2016).

The Supreme Court "has not established a definitive rule to determine what constitutes an 'abstract idea'" for the purposes of step one. *Enfish*, 822 F.3d at 1334 (citing *Alice*, 134 S. Ct at 2357). We have held claims ineligible as directed to an abstract idea when they merely collect electronic information, display information, or embody mental processes that could be performed by humans. *Elec. Power Grp.*, 830 F.3d at 1353–54 (collecting cases). At the same time, "all inventions at some level embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas." *Mayo*, 566 U.S. at 71. We must therefore ensure at step one that we articulate what the claims are directed to with enough specificity to ensure the step one inquiry is meaningful. *Alice*, 134

S. Ct. at 2354 ("[W]e tread carefully in construing this exclusionary principle lest it swallow all of patent law.").

A number of cases are instructive as to the step one analysis. In *Rapid Litigation Management Ltd. v. CellzDirect, Inc.*, we evaluated claims for an improved process of preserving a type of liver cell by taking previously frozen and thawed cells, separating viable cells from non-viable ones, and recovering and refreezing the viable cells. 827 F.3d 1042, 1045 (Fed. Cir. 2016). We held the claims patent-eligible under step one of *Alice* because they were directed to "a new and useful laboratory technique for preserving [liver cells]." *Id.* at 1048. While "the inventors certainly discovered the cells' ability to survive multiple freeze-thaw cycles," they did not claim the natural law itself, but a particular application of the "natural discovery to create a new and improved way of preserving [liver] cells for later use." *Id.*

In *Enfish LLC v. Microsoft Corp.*, we held claims directed to a self-referential logical model for a computer database patent-eligible under step one of *Alice*. 822 F.3d at 1330. The disclosed technique enabled faster searching and more effective storage of data than previous methods. *Id.* at 1333. We found the claims directed to "a specific improvement to the way computers operate, embodied in the self-referential table." *Id.* at 1336. We explained that the claims are "not simply directed to *any* form of storing tabular data, but instead are specifically directed to a *self-referential* table for a computer database" that functions differently than conventional databases. *Id.* at 1337.

In *Diamond v. Diehr*, the Supreme Court confirmed the eligibility of patent claims despite the inclusion of a mathematical formula in a claimed method for molding raw, uncured rubber into cured rubber products. 450 U.S. 175, 177 (1981). The claimed method used the well-known Arrhenius equation to calculate the optimal cure time using, among other variables, the internal tempera-

8                THALES VISIONIX INC. v. UNITED STATES

ture of the mold. *Id.* at 177 n.2. The invention improved upon prior art molding methods by constantly measuring the actual temperature inside the mold, recalculating the ideal cure time, and automatically opening the press when the ideal cure time equaled the actual time elapsed. *Id.* at 178–79.

The Supreme Court recognized that a mathematical formula like the Arrhenius equation is not itself patent-eligible subject matter, even if limited to a particular technological environment or accompanied by "insignificant post-solution activity." *Id.* at 191-92; *see Parker v. Flook*, 437 U.S. 584, 585–86, 594–95 (1978). Nonetheless, the Supreme Court held that the claims in *Diehr* covered patent-eligible subject matter because they "describe[d] a process of curing rubber beginning with the loading of the mold and ending with the opening of the press and the production of a synthetic rubber product that has been perfectly cured—a result heretofore unknown in the art." *Diehr*, 450 U.S. at 193 n.15. It explained that claims are patent eligible under § 101 "when a claim containing a mathematical formula implements or applies that formula in a structure or process which, when considered as a whole, is performing a function which the patent laws were designed to protect." *Id.* at 192. In terms of the modern day *Alice* test, the *Diehr* claims were directed to an improvement in the rubber curing process, not a mathematical formula.[2]

For the purpose of evaluating patent eligibility, the '159 patent claims are nearly indistinguishable from the claims at issue in *Diehr*. Claim 1, the independent system claim, requires: (1) a first inertial sensor mounted on

---

   [2]  *Diehr* preceded the evolution of the Supreme Court's two-step framework and therefore did not separate its analysis into the two *Alice* steps. We do not hold that *Diehr* is instructive precedent only for *Alice* step one.

the tracked object; (2) a second inertial sensor mounted on the moving platform; and (3) an element that uses the data from the two inertial sensors to calculate the orientation of the tracked object relative to the moving platform, as disclosed in the specification. Claim 22, the independent method claim, requires: (1) a first inertial sensor on a tracked object; (2) a second inertial sensor on the moving platform; and (3) the determination of orientation of the tracked object "based on" the signals from the two inertial sensors, as disclosed in the specification. The navigation equations in the '159 patent are derived from this particular arrangement of sensors. '159 patent at 7:41–8:55. While the claims utilize mathematical equations to determine the orientation of the object relative to the moving reference frame, the equations—dictated by the placement of the inertial sensors and application of laws of physics—serve only to tabulate the position and orientation information in this configuration. This arrangement is analogous to the claims in *Diehr*, which required the temperature measurement "at a location closely adjacent to the mold cavity in the press during molding." *Diehr*, 450 U.S. at 179 n.5. Just as the claims in *Diehr* reduced the likelihood that the rubber molding process would result in "overcuring" or "undercuring," *id.* at 187, the claims here result in a system that reduces errors in an inertial system that tracks an object on a moving platform.

The '159 patent claims provide a method that eliminates many "complications" inherent in previous solutions for determining position and orientation of an object on a moving platform. '159 patent at 5:62–6:32. Because the motion of a moving platform like a plane "is more dynamic and unpredictable than the earth's rotation," a traditional system (which measured inertial data with respect to the earth) had difficulty accurately calculating inertial data of an object on a moving platform. *Id.* at 5:60–6:16. Though the unconventional utilization of inertial sensors

as specified by the '159 patent "may seem somewhat strange" to those within the field, *id.* at 7:19–21, this combination of sensor placement and calculation based on a different reference frame mitigates errors by eliminating inertial calculations with respect to the earth. *Id.* at 7:41–8:41. The resulting system works with any type of moving platform and is simpler to install than conventional systems. *Id.* at 7:5–8. The system is also beneficially self-contained: it requires no external information about the orientation or position of the platform. *Id.* at 8:34–41, 11:34–38.

These claims are not merely directed to the abstract idea of using "mathematical equations for determining the relative position of a moving object to a moving reference frame," as the Claims Court found. *Thales*, 122 Fed. Cl. at 252. Rather, the claims are directed to systems and methods that use inertial sensors in a non-conventional manner to reduce errors in measuring the relative position and orientation of a moving object on a moving reference frame. At step one, "it is not enough to merely identify a patent-ineligible concept underlying the claim; we must determine whether that patent-ineligible concept is what the claim is 'directed to.'" *Rapid Litig.*, 827 F.3d at 1050. Just as a natural law can be utilized to create an improved laboratory technique for preserving liver cells, *id.* at 1048, so can the application of physics create an improved technique for measuring movement of an object on a moving platform. Just as claims directed to a new and useful technique for defining a database that runs on general-purpose computer equipment are patent eligible, *Enfish*, 822 F.3d at 1337–38, so too are claims directed to a new and useful technique for using sensors to more efficiently track an object on a moving platform. That a mathematical equation is required to complete the claimed method and system does not doom the claims to abstraction.

We hold that the '159 patent claims at issue in this appeal are not directed to an abstract idea. The claims specify a particular configuration of inertial sensors and a particular method of using the raw data from the sensors in order to more accurately calculate the position and orientation of an object on a moving platform. The mathematical equations are a consequence of the arrangement of the sensors and the unconventional choice of reference frame in order to calculate position and orientation. Far from claiming the equations themselves, the claims seek to protect only the application of physics to the unconventional configuration of sensors as disclosed. As such, these claims are not directed to an abstract idea and thus the claims survive *Alice* step one.

Because we find the claims are not directed to an abstract idea, we need not proceed to step two. *Alice*, 134 S. Ct. at 2355; *Enfish*, 822 F.3d at 1339. The claims are patent eligible under 35 U.S.C. § 101.

CONCLUSION

For the foregoing reasons, we reverse the Claims Court's determination that the '159 patent claims patent-ineligible subject matter and remand for further proceedings.

**REVERSED AND REMANDED**

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## INFORMATION SHEET

## FILING A PETITION FOR A WRIT OF CERTIORARI

There is no automatic right of appeal to the Supreme Court of the United States from judgments of the Federal Circuit. You must file a petition for a writ of certiorari which the Supreme Court will grant only when there are compelling reasons. (See Rule 10 of the Rules of the Supreme Court of the United States, hereinafter called Rules.)

**Time.** The petition must be filed in the Supreme Court of the United States within 90 days of the entry of judgment in this Court or within 90 days of the denial of a timely petition for rehearing. The judgment is entered on the day the Federal Circuit issues a final decision in your case. [The time does not run from the issuance of the mandate, which has no effect on the right to petition.] (See Rule 13 of the Rules.)

**Fees.** Either the $300 docketing fee or a motion for leave to proceed in forma pauperis with an affidavit in support thereof must accompany the petition. (See Rules 38 and 39.)

**Authorized Filer.** The petition must be filed by a member of the bar of the Supreme Court of the United States or by the petitioner representing himself or herself.

**Format of a Petition.** The Rules are very specific about the order of the required information and should be consulted before you start drafting your petition. (See Rule 14.) Rules 33 and 34 should be consulted regarding type size and font, paper size, paper weight, margins, page limits, cover, etc.

**Number of Copies.** Forty copies of a petition must be filed unless the petitioner is proceeding in forma pauperis, in which case an original and ten copies of the petition for writ of certiorari and of the motion for leave to proceed in forma pauperis. (See Rule 12.)

**Where to File.** You must file your documents at the Supreme Court.

**Clerk**
**Supreme Court of the United States**
**1 First Street, NE**
**Washington, DC 20543**
**(202) 479-3000**

No documents are filed at the Federal Circuit and the Federal Circuit provides no information to the Supreme Court unless the Supreme Court asks for the information.

**Access to the Rules.** The current rules can be found in Title 28 of the United States Code Annotated and other legal publications available in many public libraries.

Revised December 16, 1999

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

*Questions and Answers*

**Petitions for Rehearing (Fed. Cir. R. 40)
and
Petitions for Hearing or Rehearing En Banc (Fed. Cir. R. 35)**

---

*Q. When is a petition for rehearing appropriate?*

A. Petitions for panel rehearing are rarely successful because they most often fail to articulate sufficient grounds upon which to grant them. For example, a petition for panel rehearing should not be used to reargue issues already briefed and orally argued; if a party failed to persuade the court on an issue in the first instance, a petition for panel rehearing should not be used as an attempt to get a second "bite at the apple." This is especially so when the court has entered a judgment of affirmance without opinion under Fed. Cir. R. 36.  Such dispositions are entered if the court determines the judgment of the trial court is based on findings that are not clearly erroneous, the evidence supporting the jury verdict is sufficient, the record supports the trial court's ruling, the decision of the administrative agency warrants affirmance under the appropriate standard of review, or the judgment or decision is without an error of law.

*Q. When is a petition for hearing or rehearing en banc appropriate?*

A. En banc decisions are extraordinary occurrences. To properly answer the question, one must first understand the responsibility of a three-judge merits panel of the court. The panel is charged with deciding individual appeals according to the law of the circuit as established in the court's precedential opinions. While each merits panel is empowered to enter precedential opinions, the ultimate duty of the court en banc is to set forth the law of the Federal Circuit, which merit panels are obliged to follow.

Thus, as a usual prerequisite, a merits panel of the court must have entered a precedential opinion in support of its judgment for a suggestion for rehearing en banc to be appropriate. In addition, the party seeking rehearing en banc must show that either the merits panel has failed to follow identifiable decisions of the U.S. Supreme Court or Federal Circuit precedential opinions or that the merits panel has followed circuit precedent, which the party seeks to have overruled by the court en banc.

*Q. How frequently are petitions for rehearing granted by merits panels or petitions for rehearing en banc accepted by the court?*

A. The data regarding petitions for rehearing since 1982 shows that merits panels granted some relief in only three percent of the more than 1900 petitions filed. The relief granted usually involved only minor corrections of factual misstatements, rarely resulting in a change of outcome in the decision.

En banc petitions were accepted less frequently, in only 16 of more than 1100 requests. Historically, the court itself initiated en banc review in more than half (21 of 37) of the very few appeals decided en banc since 1982. This sua sponte, en banc review is a by-product of the court's practice of circulating every precedential panel decision to all the judges of the Federal Circuit before it is published. No count is kept of sua sponte, en banc polls that fail to carry enough judges, but one of the reasons that virtually all of the more than 1100 petitions made by the parties since 1982 have been declined is that the court itself has already implicitly approved the precedential opinions before they are filed by the merits panel.

*Q. Is it necessary to have filed either of these petitions before filing a petition for certiorari in the U.S. Supreme Court?*

A. No. All that is needed is a final judgment of the Court of Appeals. As a matter of interest, very few petitions for certiorari from Federal Circuit decisions are granted. Since 1982, the U.S. Supreme Court has granted certiorari in only 31 appeals heard in the Federal Circuit.  Almost 1000 petitions for certiorari have been filed in that period.

October 20, 2016